1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOSUE CASTAÑEDA JUAREZ, et al.,

           Petitioners-Plaintiffs,

     v.

NATHALIE ASHER, et al.,

           Respondents-Defendants.

CASE NO. C20-0700JLR-MLP

ORDER DENYING MOTION FOR
TEMPORARY RESTRAINING ORDER

## I.      INTRODUCTION

Before the court is Petitioner-Plaintiffs Jose Castañeda Juarez, Wilfredo Favela Avendaño, J.A.M. and Naeem Khan's (collectively, "Petitioners") motion for a temporary restraining order ("TRO") (TRO Mot. (Dkt. #22).) Respondent-Defendants Nathalie Asher, Matthew T. Albence, Steven Langford, and United States Immigration and Customs Enforcement's ("ICE") (collectively, "Respondents") oppose Petitioners' TRO motion. (*See* Resp. (Dkt. #62).)

//

//

//

ORDER – 1

1    The court has reviewed Petitioners' motion, the response, the petition and complaint[1]

2  (Compl. (Dkt. #1)), the parties' submissions related to the motion, the relevant portions of the

3  record, the applicable law, and heard oral argument on May 27, 2020.  Being fully advised, the

4  court DENIES Petitioners' motion for a TRO.

5                    **II.    BACKGROUND**

6  **A.  Procedural Background**

7    Plaintiffs are three[2] individuals held in civil detention by ICE at the Tacoma Northwest

8  Detention Center ("NWDC")[3] in Tacoma, Washington. (*See* Compl. ¶¶ 39-66.) On May 8, 2020,

9  Petitioners filed their petition, seeking a writ of habeas corpus, or in the alternative, injunctive

10  relief, against Respondents. (*Id.*) Petitioners represent that they are "vulnerable to serious medical

11  complications from COVID-19 and are at risk of serious illness and death so long as they are held

12  in detention" due to their medical conditions. (*Id.* ¶ 95.)  On May 11, 2020, Petitioners filed the

13  present motion seeking "immediate release" from detention as they await adjudication of their

14  immigration cases. (TRO Mot. at 7.) Petitioners argue that because Defendants cannot remedy the

15  grave risk of harm they face from COVID-19, their continued detention at the NWDC violates

16  their Fifth Amendment rights. (*Id.* at 14.)

17  //
   //

18

19  [1] Petitioner-Plaintiffs' initial filing is a "petition for writ of habeas corpus . . . and class action
   complaint for injunctive and declaratory relief." (*See* Compl. at 1.) For simplicity's sake, the court

20  refers to the parties as "Petitioners" and "Respondents" and the petition-complaint as the
   "petition."

21
   [2] Respondents confirm that Petitioner J.A.M. was recently released, leaving only three named

22  Petitioners in this action: Mr. Castañeda Juarez, Mr. Avedaño, and Mr. Khan.  (Bostock Decl.
   (Dkt. #63) ¶ 79.)

23
   [3] The NWDC is also referred to as the Northwest ICE Processing Center ("NWIPC").   (*See*
   Bostock Decl. ¶ 1.)

ORDER – 2

1    After hearing oral argument, the court found that Respondents' failure to conduct

2  comprehensive testing had left a critical factual question—whether COVID-19 is already present

3  at the facility—to pure speculation, despite the fact that Respondents confirmed they had the

4  resources and capability to address this fundamental factual question. (*See* 5/28/20 Order (Dkt.

5  #78) at 7.) Accordingly, the court ordered Respondents to show cause explaining why ICE, in

6  consultation with its contractor the GEO Group ("GEO"), could not immediately (a) begin testing

7  detainees at the Northwest Detention Center ("NWDC") on a voluntary basis; and (b) implement

8  a plan for those that refuse testing. (*Id.*)

9    In response to the court's May 28, 2020, show cause order, Respondents filed a Declaration

10  from Stephen Langford, the NWDC facility administrator, stating that ICE implemented the

11  "COVID-19 Collection and Testing Operational Plan" to begin comprehensive testing of the 563

12  detainees currently housed at the NWDC. (2d Langford Decl. (Dkt. #82).) Respondents also filed

13  a memorandum dated May 28, 2020, outlining the procedures under this plan for testing all

14  detainees who consented to a test and setting forth protocol in the event that a detainee refused

15  testing. (2d Lippard Decl. (Dkt. #80) Ex. A.)

16  **B.  Conditions at the NWDC**

17    The parties rely on a series of declarations in support of and in opposition to Petitioners'

18  motion. Petitioners rely primarily on (1) individual declarations of Petitioners and other current

19  and former NWDC detainees (*see, e.g.*, Castañeda Juarez Decl. (Dkt. #8); Avendaño Decl. (Dkt.

20  #7); J.A.M. Decl. (Dkt. #11); Khan Decl. (Dkt. #9); Bonarov Decl. (Dkt. #14); Reyes Decl. (Dkt.

21  #10); Gonzalez Decl. (Dkt. #12); Nuñez Decl. (Dkt. #13)); (2) expert declarations from infectious

22  disease specialists, medical professionals, and administrators with expertise in civil and criminal

23  detention systems (*see, e.g.*, Amon Decl. (Dkt. #3); McKenzie Decl. (Dkt. #4); Golob Decl. (Dkt.

ORDER – 3

1  #5); Schriro Decl. (Dkt. #6)); and (3) declarations from counsel who have visited their clients,

2  including Petitioners, at the NWDC over the past month (*see, e.g.*, Augustine Decl. (Dkt. #16);

3  Nerheim Decl. (Dkt. #15); Ngo Decl. (Dkt. #23)).

4       Respondents rely primarily on the declarations of (1) Drew H. Bostock, the Officer in

5  Charge with the U.S. Department of Homeland Security ("DHS"), ICE, Enforcement and Removal

6  Operations in the Seattle Field Office ("ERO Seattle") (Bostock Decl. (Dkt. #63)); (2) NWDC

7  Facility Administrator Stephen Langford (Langford Decl. (Dkt. #67)); (3) Clinical Director for the

8  ICE Health Services Corps ("IHSC") Sheri Malakhova (1st Malakhova Decl. (Dkt. #64)); and (4)

9  Lieutenant Commander of IHSC, Ranay Yonkers (Yonkers Decl. (Dkt. #65)).

10       1.   Detainee Testing and COVID-19-Positive Detainees

11       Prior to May 28, 2020, COVID-19 tests were administered at the NWDC based on

12  guidance issued by the CDC. This guidance directs clinicians to use their judgment in determining

13  if a patient has signs and symptoms consistent with COVID-19. (1st Malakhova Decl. ¶¶ 23, 25.)

14  Any detainee who was positive or "presumptively positive" was placed in an individual unit in the

15  Medical Housing Unit ("MHU").  (*Id.* ¶ 26.) The MHU has eight isolation rooms, which include

16  four negative pressure rooms designed to help prevent the spread of airborne particles. Two empty

17  housing units are also designated as medical overflow units in the event that space runs out at the

18  MHU.

19       Between May 28 and June 2, 2020, ICE and GEO tested all detainees at the NWDC who

20  consented to a COVID-19 test. (2d Langford Decl. at 2.) On June 8, 2020, Respondents reported

21  the results of the comprehensive testing. Of the 561 detainees housed at the NWDC, 449 of the

22  450 detainees tested negative for COVID-19, and 111 detainees refused testing. (2d Malakhova

23  Decl. (Dkt. #89) ¶ 3.) The one detainee that tested positive arrived at the NWDC on May 29, 2020,

ORDER – 4

1   and was still in his 14-day quarantine period in the New Intake Monitoring Unit at the time of

2   testing. (*Id.* ¶ 4.) After receiving the positive test result, ICE moved the COVID-19-positive

3   detainee to the MHU for observation. His cellmate, who tested negative for the virus, will remain

4   in the intake unit for 14 more days.

5         2.   Newly-arrived Detainees

6         As of March 20, 2020, new detainees arriving at the NWDC are housed based on their date

7   of arrival and risk classification level. (Bostock Decl. ¶ 20.) The newly-arrived detainees are

8   housed among three separate housing units for a 14-day observational period and not permitted to

9   comingle with other detainees. The three housing units contain individual cells to house new

10  detainees—one for female detainees and two for male detainees. Respondents clarified at oral

11  argument that separate cells within housing units hold up to four detainees, meaning that

12  newly-arrived detainees with no symptoms of COVID-19 are housed with no more than three other

13  people. (May 27, 2020 Motion Hearing Transcript ("Mot. Hrg. Tr.") at 19:13-16.) After the 14-day

14  isolation period is complete, detainees without symptoms of COVID-19 are released into the

15  general NWDC population. (Bostock Decl. ¶ 20.)

16        Starting June 4, 2020, all detainees arriving at the NWDC who consent to testing will be

17  tested for COVID-19 as part of their intake screening. (2d Malakhova Decl. ¶ 5.) Any

18  newly-arrived detainee who tests positive for COVID-19 at intake will be transferred to the MHU

19  for monitoring. (*Id.*)

20        3.   Social Distancing Measures

21        The NWDC has the capacity to house 1,575 detainees and historically operates near

22  capacity. (Bostock Decl. ¶ 6.) However, as of May 17, 2020, the NWDC housed only 645 detainees

23  and is currently operating at 40.9% of its typical capacity. (*Id.* ¶ 7.) As of June 8, 2020, the detainee

ORDER – 5

1    population was further reduced to 561. (2d Malakhova Decl. ¶ 3). In addition to reducing the

2    detainee population, ICE has redistributed the population among housing units to allow for greater

3    social distancing. (Bostock Decl. ¶¶ 6, 10, 30-31.) Of the fifteen units containing detainees, GEO

4    has spread out the population and required head-to-foot sleeping arrangements to maximize social

5    distancing. (*Id.*) Starting the week of April 6, 2020, ICE and GEO started interviewing certain

6    high-risk detainees to see if they would agree to special accommodations such as single cells or

7    more sparsely-populated units. (Bostock Decl. ¶ 35.) In addition to spreading out the detainee

8    population across the facility, Respondents have attempted to minimize commingling between

9    different housing units by assigning specific times for recreation, religious services, and use of the

10   law library. (*Id.* at ¶¶ 38-39.) Detainees are also permitted to eat at their beds to practice greater

11   social distancing rather than sit next to each other at tables during mealtimes. (*Id.* at ¶¶ 35-37.)

12       Notwithstanding the reduced detainee population, detainees report sharing limited

13   bathroom, bathing, and handwashing facilities with those in their housing units, as well as tablets,

14   exercise equipment, phones, and various other surfaces throughout the day. (Juarez Decl. ¶¶ 3-6;

15   Avedaño Decl. ¶¶ 9-12.) Even if they return to eat at their beds, detainees must stand in lines during

16   mealtimes or to microwave their food. (Dkt. #12 (Gonzalez Decl.) at ¶ 6; Dkt. #9 (Khan Decl.) at

17   ¶ 8.) Other activities, including attending immigration court, waiting for medical appointments, or

18   participating in daily one-hour recreation times, places detainees into close contact. (Juarez Decl.

19   ¶¶ 9-10; Avedaño Decl. ¶ 13; Gonzalez Decl. ¶ 5.) Petitioners have also presented evidence that,

20   based on the spatial arrangements within NWDC housing units as described in the Langford and

21   Bostock declarations, it is physically impossible for detainees to consistently maintain six feet of

22   distance from one another. (*See* McEwen Decl. (Dkt. #72) Ex. B.)

23   //

ORDER – 6

1        4.  Hygiene Measures

2        Under ICE's current protocols for COVID-19 response, high-touch areas at the NWDC

3    must be cleaned and disinfected multiple times per day. (Bostock Decl. ¶ 22.) GEO has also

4    implemented enhanced measures in housing units, food preparation and service areas, and intake

5    rooms. (*Id.* ¶ 23 ("In response to COVID-19, GEO has informed ICE that it has enhanced cleaning

6    in all housing units, food preparation and service area, intake rooms and other work centers with

7    increased emphasis on cleaning contact areas with disinfectant cleaners approved as effective

8    against COVID-19.").)

9        GEO delegates responsibility for maintaining the cleanliness of its facilities to detainees,

10   who are engaged as part of the NWDC's Voluntary Work Program. (*Id.* ¶ 23.)  A GEO Sanitation

11   Officer is responsible for monitoring the detainee workers, and GEO has enrolled and trained two

12   additional workers per housing unit to conduct enhanced cleaning. (*Id.*) However, detainees report

13   that GEO and ICE fail to adequately supervise the cleaning and, as a result, common areas and

14   shared devices, like phones and tablets, are not always adequately cleaned between uses.  (*See,*

15   *e.g.*, Khan Decl. ¶¶ 8-9; Gonzalez Decl. ¶ 12 (stating that phones and exercise equipment are only

16   cleaned "every few days"); Nuñez Decl. ¶ 10 (citing concerns that tablets are not sufficiently

17   sanitized between uses).) Detainees also report that they run out of supplies, such as soap and paper

18   towels. (*See, e.g.*, Castañeda Juarez Decl. ¶ 6; Adekunle Decl. ¶ 8; Khan Decl. ¶¶ 11-12.)

19       5.  Visitors and Staff

20       ICE has temporarily suspended social visitation at the NWDC. However, attorneys,

21   contractors, and religious service providers still enter the facility and interact with detainees.

22   (Bostock Decl. ¶¶ 40-45.) Visitors are required to wear personal protective equipment ("PPE")

23   (*see id.*), but Petitioners provide an account from Andrew W. Augustine, an attorney testifying on

ORDER – 7

1    behalf of petitioners, which states that counsel were not wearing PPE in the main waiting area for

2    the immigration courtroom nor in the video teleconference courtroom. (Augustine Decl. (Dkt. #16)

3    ¶¶ 5-11.)

4         ICE and GEO staff are encouraged to voluntarily wear masks but are not required to do so.

5    (Bostock Decl. ¶¶ 48-49.) Detainees report that certain guards refuse to wear masks. (*See, e.g.,*

6    Khan Decl. at ¶ 13; Avedaño Decl. at ¶ 16; Juarez Decl. at ¶ 13-14 ("If I or other detainees ask the

7    guards to put on masks, they will laugh at us and tell us that it is not required.").) Another attorney

8    testifying on behalf of Petitioners, Mark Nerheim, corroborates detainees' accounts of GEO staff's

9    general refusal to wear masks. Specifically, Mr. Nerheim claims that he has "witnessed a very

10   cavalier attitude" by some guards in terms of adhering to COVID-19 protocols, including refusal

11   to complete facility entrance forms, ignoring safe distancing protocols, and refusal to wear masks.

12   (Nerheim Decl. (Dkt. #15) ¶¶ 5-6.) Although GEO employees are required to notify their employer

13   if they test positive, GEO is not required to notify ICE if any of its staff members have been tested

14   or diagnosed with COVID-19. (Bostock Decl. ¶ 49.)

15       **C. Petitioners and Their Detention Statuses**

16        Mr. Castañeda Juarez is 36 years old and a citizen of Mexico. (Castañeda Juarez Decl. ¶ 1.)

17   He was removed from the United States in 2009 and again in 2011 and was most recently

18   apprehended by ICE on March 20, 2020.  (Bostock Decl. ¶ 71.) Mr. Castañeda Juarez has a pending

19   asylum claim and has moved to reopen his 2009 removal proceedings.  (*Id.* ¶ 74.) Although his

20   medical record lists a diagnosis of "mild intermittent asthma," Petitioners' expert witness, Dr.

21   Katherine C. McKenzie, concludes that Mr. Castañeda Juarez "would qualify for a diagnosis of

22   moderate persistent asthma" based on the medications he takes to prevent daily asthma symptoms.

23   (McKenzie Decl. ¶ 27; *see also id.*, Ex. 2 at 5.) His medical records also list a diagnosis of mild

ORDER – 8

1    aortic stenosis in February 2020, and a medical history of chronic asthma.  (*Id.*)  He is not eligible

2    for a bond hearing because he is detained pursuant to 8 U.S.C. § 1231(a)(6),[4] but he will be eligible

3    once detained for 180 days. *See Florez Tejada v. Godfrey*, 954 F.3d 1245 (9th Cir. 2020).  IHSC

4    identified Mr. Castañeda Juarez as higher risk, and he accepted ICE's offer to be housed in a unit

5    at 37.8% capacity.  (Bostick Decl. ¶ 75.) If released, Mr. Castañeda Juarez states he would return

6    to Vancouver, Washington to live with his spouse and five children at their apartment. (Castañeda

7    Juarez Decl. ¶ 20.)

8          Mr. Favela Avendaño is 46 years old and a citizen of Mexico. (Favela Avendaño Decl.

9    ¶ 1.) He suffers from moderate persistent asthma and uses an inhaler twice a day. (*Id.* ¶ 4;

10    McKenzie Decl. ¶ 26.) He is currently housed in a unit at 57.8% capacity.  Mr. Favela Avendaño

11    was convicted of Driving Under the Influence in 2014 and arrested for DUIs in 2019 and 2020.

12    (Bostock Decl. ¶ 76.) He is held under 8 U.S.C. § 1226(a) and therefore statutorily eligible for a

13    bond hearing. If released, he plans to live with his brother in Federal Way, Washington. (Favela

14    Avendaño Decl. ¶ 20.)

15          Mr. Khan is 47 years old, a citizen of Pakistan and a Lawful Permanent Resident of the

16    United States. (Khan Decl. ¶ 1.) He is detained and subject to removal based on his continued

17    violation of a domestic violence no contact order issued by the Snohomish County District Court

18    and criminal stalking of his ex-wife. (Bostock Decl. ¶ 78; Khan Decl. ¶ 2.) An Immigration Judge

19    granted him cancellation of removal for certain residents under 8 U.S.C. § 1229b(a), but DHS

20    appealed the decision. Mr. Khan is held under 8 U.S.C. § 1226(a) while his appeal is pending. An

21

22    [4] A detainee held under this provision is "inadmissible under section 1182 of this title, removable
under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by
23    the Attorney General to be a risk to the community or unlikely to comply with the order of removal,
may be detained beyond the removal period and, if released, shall be subject to the terms of
supervision in paragraph (3)."  8 U.S.C. § 1231(a)(6).

ORDER – 9

1   Immigration Judge denied him bond based on a finding that he was a danger to the community and

2   a flight risk based on his continued violation of the protective order. (*Id.*; Bostock Decl. ¶ 78.) Mr.

3   Khan manages his diabetes with oral medication (McKenzie Decl. ¶ 24), and is housed in a unit at

4   37.8% capacity.  He claims that he could effectively manage his diabetes in state custody but

5   cannot eat and exercise appropriately at the NWDC, thereby exacerbating his diabetes. (Khan

6   Decl. ¶ 3.) If released, Mr. Khan will stay with his friend while he determines his long-term living

7   options. (*Id.* ¶ 17.)

8                                                 **III.    ANALYSIS**

9        **A.  Legal Standard**

10          The standard for issuing a TRO is the same as the standard for issuing a preliminary

11   injunction. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2

12   (1977). A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that

13   the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

14   "The proper legal standard for preliminary injunctive relief requires a party to demonstrate (1)

15   'that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the

16   absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an

17   injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009)

18   (citing *Winter*, 555 U.S. at 20).

19          As an alternative to this test, a preliminary injunction is appropriate if "serious questions

20   going to the merits were raised and the balance of the hardships tips sharply in the plaintiff's

21   favor," thereby allowing preservation of the status quo when complex legal questions require

22   further inspection or deliberation. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35

23   (9th Cir. 2011). However, the "serious questions" approach supports the court's entry of a TRO

ORDER – 10

1   only if the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction

2   is in the public interest. *Id.* at 1135. The moving party bears the burden of persuasion and must

3   make a clear showing that it is entitled to such relief. *Winter*, 555 U.S. at 22.

4        For the reasons set forth below, the court DENIES Petitioners' motion for a TRO.

5   **B. Likelihood of Success on the Merits**

6        To obtain a TRO, Petitioners must make a clear showing that they are likely to succeed on

7   the merits or, alternatively, have raised serious questions going to the merits of their habeas

8   petition. To succeed on a habeas petition, Petitioners must show that they are "in custody in

9   violation of the Constitution or laws or treaties of the United States." *See* 28 U.S.C. § 2241. Here,

10  Petitioners argue that their continued detention in conditions that present an unreasonable risk of

11  serious illness or death violate their Fifth Amendment substantive due process rights[5] to (1)

12  reasonably safe conditions of confinement and (2) conditions that do not amount to punishment.

13  (TRO Mot. at 14-19.) For the reasons stated below, the court concludes that Petitioners have failed

14  to make a clear showing that they are likely to succeed on the merits of their Fifth Amendment

15  claims, or that they have raised serious questions going to the merits of their claims.

16        1.   Right to Reasonably Safe Conditions

17        "[W]hen the State takes a person into its custody and holds him there against his will, the

18  Constitution imposes upon it a corresponding duty to assume some responsibility for his safety

19  and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189,

20  199-200 (1989).[6] The government thus violates the Due Process Clause if it fails to provide civil

21

22  [5] As federal civil detainees, Petitioners are protected by the Fifth Amendment. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

23  [6] In *DeShaney*, the Supreme Court analyzed the petitioners' rights under the Fourteenth Amendment.  *See* 489 U.S. at 194-95. Fifth Amendment due process claims and Fourteenth

ORDER – 11

1   detainees with "food, clothing, shelter, medical care, and reasonable safety."  *Id.* at 200. In the

2   context of a "failure to protect" claim under the Due Process Clause, the Ninth Circuit analyzes

3   government conduct under an objective deliberate indifference standard. *See Castro v. Cty. of L.A.*,

4   833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (adopting objective deliberate indifference standard

5   based on *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466 (2015), to evaluate failure to

6   protect claim brought by pretrial detainee). Under this standard, the defendant's conduct "must be

7   objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each

8   particular case." *Id.* (internal quotations omitted). To demonstrate objective deliberate

9   indifference, a plaintiff must show:

10      (i) The defendant made an intentional decision with respect to the conditions
        under which the plaintiff was confined;

11

        (ii) Those conditions put the plaintiff at substantial risk of suffering serious harm;

12

        (iii) The defendant did not take reasonable available measures to abate that risk,
13      even though a reasonable officer in the circumstances would have appreciated the
        high degree of risk involved—making the consequences of the defendant's
14      conduct obvious; and

15      (iv) By not taking such measures, the defendant caused the plaintiff's injuries.

16   *Id.*

17      Petitioners argue that because they are at high risk from serious illness or death if they

18   contract COVID-19, Respondents' failure to take reasonable measures to abate their risk of

19   contracting the virus at the NWDC subjects them to a substantial risk of serious harm. (*See* TRO

20   Mot. at 16-17.) These alleged actions include constant transfer of detainees from facilities with

21   known COVID-19 outbreaks, failure to adequately screen staff and detainees for asymptomatic

22

23

Amendment due process claims are analyzed in the same way. *See Paul v. Davis*, 424 U.S. 693,
702 n.3 (1976).

ORDER – 12

1  infection, and confinement of Petitioners in conditions where they cannot practice adequate social

2  distancing and proper hygiene. (*Id.* at 16-17.) At oral argument, Petitioners clarified their position

3  that even if Respondents could implement better hygiene measures, social distancing remains

4  impossible at the NWDC by nature of the facility's structural and operational limitations.

5  Petitioners also cite to previous decisions by this court that evaluated conditions at the NWDC and

6  found, based on the particular circumstances of the petitioner, that relief was warranted. *See, e.g.*,

7  *Pimentel-Estrada v. Barr*, No. C20-495 RSM-BAT, 2020 WL 2092430, at *11-*16 (W.D. Wash.

8  Apr. 28, 2020) (identifying "glaring deficiencies" in the Government's efforts to protect high-risk

9  detainees from serious harm). Petitioners claim that the same "glaring deficiencies" identified in

10  *Pimentel-Estrada* remain unaddressed by Respondents. (TRO Mot. at 16.)

11       In response, Respondents have outlined their substantial efforts to prevent COVID-19 from

12  entering and spreading at the NWDC, including screening of newly-arrived detainees, reducing

13  the population to allow for more effective social distancing, and improving hygiene measures. (*See*

14  Resp. at 15-19.) Based on these extensive measures, Respondents contend, Petitioners have no

15  basis for claiming their detention violates their Fifth Amendment right to reasonable safety. (*Id.* at

16  19.) Nevertheless, Petitioners insist that ICE and GEO's measures are "woefully insufficient"

17  because (1) COVID-19 is already present at the facility; (2) large numbers of medically vulnerable

18  detainees remain at the facility, guaranteeing the facility will be overrun when an outbreak occurs;

19  (3) Respondents have failed to implement comprehensive testing; (4) detainees cannot practice

20  social distancing; and (5) hygiene and sanitation measures are inadequate. (TRO Reply (Dkt. #68)

21  at 4-11.) For these reasons, Petitioners argue that Respondents have failed to take reasonable steps

22  //

23

ORDER – 13

1    to protect them from the substantial risk of harm from COVID-19, and therefore violate their Fifth

2    Amendment rights. (*Id.* at 11-12.)

3        Having considered the particular facts and circumstances of this case, *see Castro*, 833 F.3d

4    at 1071, the court finds Petitioners unlikely to succeed on their claim that Respondents have

5    violated their Fifth Amendment right to reasonable safety at the NWDC. Both parties' arguments

6    hinge on contradictory assumptions as to whether Respondents' efforts reasonably prevent and

7    contain the spread of coronavirus through the NWDC. Although Petitioners take the position that

8    the virus' entry into the NWDC is not only likely but inevitable, and, perhaps, has already occurred,

9    Respondents counter that rigorous screening, testing, and quarantine measures pursuant to CDC

10   protocols reasonably abate the risk. (*Compare* TRO Mot. at 2 *with* Resp. at 18.) In support of their

11   respective positions, parties have provided a series of declarations wherein Respondents describe

12   various measures implemented for detainee testing, asymptomatic screening, social distancing,

13   hygiene, and minimizing exposure to visitors and staff, and Petitioners identify where each of these

14   measures falls short. (*See supra*, Section II.B.)

15       Now that Respondents have tested most of the detainee population at the NWDC, the issue

16   of whether Respondents' measures reasonably prevent and contain the virus' spread through the

17   detention center is far less speculative. The June 8, 2020, report provides factual support for

18   Respondents' claims that their efforts are sufficient to protect detainees from contracting the virus.

19   (*See* 2d Malakhova Decl. ¶ 4.) With only one detainee out of 450 testing positive, and the tested

20   population comprising 80% of the total detainee population, the court cannot reasonably conclude

21   that COVID-19 is spreading undetected through the NWDC. Furthermore, considering these test

22   results in light of the measures that Respondents have implemented to prevent and contain the

23   virus' spread, the court cannot reasonably find that an outbreak of COVID-19 at the NWDC is

ORDER – 14

1    likely to occur. (*Id.* ¶ 5 (explaining implementation of voluntary testing of all newly-arrived

2    detainees at the NWDC).)

3          Given this evidence, the court cannot conclude that current conditions at the NWDC place

4    Petitioners at risk of substantial harm or that Respondents' efforts fail to reasonably abate the risk

5    of infection for vulnerable detainees. Accordingly, Petitioners have failed to demonstrate a

6    likelihood of success on the merits of their Fifth Amendment "reasonable safety" claim or that

7    they have raised serious questions going to the merits of their claim.

8          2.   Conditions Amounting to Punishment

9          The court will now address Petitioners' argument that their continued detention violates

10   due process because it amounts to punishment. (*See* TRO Mot. at 18.) To evaluate the

11   constitutionality of a pretrial detention condition under the Fifth Amendment, a district court must

12   determine whether those conditions "amount to punishment of the detainee." *Bell v. Wolfish*, 441

13   U.S. 520, 535 (1979); *see also Kingsley*, 135 S. Ct. at 2473-74 (2015). Punishment may be shown

14   through an express intent to punish or a restriction or condition that "is not reasonably related to a

15   legitimate governmental objective." *Bell*, 441 U.S. at 539; *see also Kingsley*, 135 S. Ct. at 2473-74

16   (clarifying that "a pretrial detainee can prevail by providing only objective evidence that the

17   challenged governmental action is not rationally related to a legitimate governmental objective or

18   that it is excessive in relation to that purpose"). Petitioners raise only the second test, arguing that

19   the risk they face of serious illness or death from COVID-19 exceeds or is independent of the

20   inherent discomforts of confinement and is not reasonably related to or is excessive in relation to

21   a legitimate governmental interest. (TRO Mot. at 18. (citing *Unknown Parties v. Johnson*, No.

22   CV 15-250-TUC-DCB, 2016 WL 8188563, at *5 (D. Ariz. Nov. 18, 2016).)

23   //

ORDER – 15

1    Here, Petitioners have failed to make a clear showing that their continued detention is not

2    reasonably related or excessive to a legitimate government interest. The Supreme Court has

3    recognized a legitimate government interest in ensuring that non-citizens appear for their removal

4    or deportation proceedings and protecting the community from harm. *See Jennings v. Rodriguez*,

5    --- U.S. ---, 138 S. Ct. 830, 836 (2018); *Demore v. Kim*, 538 U.S. 510, 520-22 (2003); *Zadvydas*

6    *v. Davis*, 533 U.S. at 690-91. Although Petitioners argue that the imminent danger posed by

7    COVID-19 outweighs any government interest in effectuating removal and protecting the

8    community (TRO Mot. at 18.), the court cannot conclude that the risk of COVID-19 at the NWDC

9    is "imminent." Indeed, Respondents' substantial steps to abate the risk of COVID-19 and the June

10   8, 2020, report on the results from comprehensive testing indicate that Respondents' measures

11   have thus far been effective at preventing a COVID-19 outbreak and containing the virus' spread.

12   Based on this record, the court cannot conclude that Petitioners face imminent danger that

13   outweighs the government's interests here. Accordingly, the court finds Petitioners unlikely to

14   succeed on their Fifth Amendment due process claim that their continued detention amounts to

15   punishment.

16   **C. Likelihood of Irreparable Harm**

17   The court also concludes that Petitioners have failed to meet their burden to show that

18   "irreparable harm is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. As described

19   above, the June 8, 2020, results from the COVID-19 Collection and Testing Operational Plan

20   indicate that Respondents' measures have, thus far, prevented an outbreak of COVID-19 in the

21   NWDC's general population. (*See* 2d Malakhova Decl. ¶ 4.) Furthermore, to the extent that

22   Petitioners claim there is a future risk of COVID-19 entering the NWDC through an asymptomatic

23   or pre-symptomatic new arrival, Respondents have reasonably addressed this concern by

ORDER – 16

1    implementing voluntary testing of all newly-arrived detainees. (*Id.* ¶ 5.)  Detainees who refuse

2    tests will be housed separately in the New Intake Monitoring Units for the 14-day observation

3    period before they are integrated into the general population. (*Id.*) Consequently, the court cannot

4    conclude from the current record that COVID-19 is currently spreading undetected through the

5    general detainee population, nor that the virus' spread to detainees, including Petitioners, is likely

6    in light of Respondents' measures. As this court previously acknowledged in *Dawson v. Asher*,

7    "[n]o one can entirely guarantee safety in the midst of a global pandemic." No. C20-0409JLR-

8    MAT, 2020 WL 1704324, at *12 (W.D. Wash. Apr. 8, 2020). Yet the applicable standard on a

9    motion for a TRO is likelihood of irreparable harm—not guaranteed safety—and the record before

10   the court does not meet that standard.[7]

11           Accordingly, the court DENIES Petitioners' motion for a TRO.

12                           **IV.    CONCLUSION**

13           For the foregoing reasons, the court DENIES Petitioners' motion for a

14   temporary restraining order (Dkt. #22).

15           Dated this 12th day of June, 2020

16   _____
     JAMES L. ROBART

17   United States District Judge

     Recommended for Entry
18   this 12th day of June, 2020.

19

20   _____
     MICHELLE L. PETERSON

21   United States Magistrate Judge

22

23
     _____
     [7] Having concluded that Petitioners fail to meet the first two prongs of the TRO standard, the court
     finds it unnecessary to address the third and fourth prongs at this time.

     ORDER – 17