UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILFREDO FAVELA AVENDAÑO, *et al.*,

Petitioners-Plaintiffs,

v.

NATHALIE ASHER, *et al*.,

Respondents-Defendants.

CASE NO. C20-0700JLR-MLP

ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND EXPEDITED BAIL HEARINGS

## I. INTRODUCTION

Before the court is Petitioners-Plaintiffs' ("Petitioners") second motion for a temporary restraining order. (TRO (Dkt. # 175).) Respondents-Defendants ("Respondents") oppose Petitioners' motion. (*See* Resp. (Dkt. # 181).) The court has reviewed Petitioners' motion, the response, the amended petition and complaint (dkt. # 167), the parties' submissions related to the motion, the relevant portions of the record, the applicable law, and heard oral argument. Being fully advised, the court DENIES Petitioners' motion.

ORDER – 1

## II. BACKGROUND

### A. Procedural Background

Petitioners are individuals either currently or previously held in civil detention by U.S. Immigration and Customs Enforcement ("ICE") at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington.[1] (*See* Compl. (Dkt. # 1).) On May 8, 2020, Petitioners filed their initial petition and complaint seeking a writ of habeas corpus and injunctive and declaratory relief against Respondents. (*See generally id.*) Petitioners argued they are "vulnerable to serious medical complications from COVID-19 and are at risk of serious illness and death so long as they are held in detention" due to their medical conditions. (*Id.* at ¶ 95.)

On May 11, 2020, Petitioners filed a motion for a temporary restraining order seeking immediate release from detention as they await adjudication of their immigration cases and a motion for class certification. (Dkt. ## 22, 21.) Petitioners argued that because Respondents cannot remedy the alleged grave risk of harm that they, and others similarly situated, face from COVID-19, their continued detention violates their Fifth Amendment rights. (Dkt. # 22 at 13.) On June 12, 2020, the Court denied Petitioners' motion for a temporary restraining order. (Dkt. # 91.) The court found Petitioners were unlikely to succeed on their claim that Respondents violated their Fifth Amendment right to reasonable safety at the NWIPC. (*Id.* at 14-15.) The Court also found Petitioners failed to make a clear showing that their continued detention amounted to punishment as Respondents had taken substantial steps to prevent a COVID-19 outbreak, and further that Petitioners failed to establish irreparable harm. (*Id*. at 16-17.)

---

[1] J.A.M. has been released from custody. (5/15/2020 Bostock Decl. (Dkt. #63) ¶ 79.) Respondents recently released Petitioner Wilfredo Favela Avendaño. (Dkt. # 151-1.)

ORDER – 2

On July 16, 2020, Respondents filed a return memorandum and motion to dismiss the petition. (Dkt. # 102.) The court denied Respondents' motion and directed the parties to submit proposed discovery requests, which the parties submitted, and the court has since ruled on.[2] (Dkt. ## 124, 161.) The court also denied Petitioners' motion for class certification, finding Petitioners failed to satisfy the requirements of Federal Rule of Civil Procedure 23(b)(2) for an indivisible, uniform remedy that would provide relief to the proposed class due to the case-by-case considerations needed to determine whether release is appropriate for each individual. (Dkt. # 121.)

On November 4, 2020, Petitioners moved to amend their petition, seeking to modify their request for relief in response to the court's finding regarding the uniformity requirement of Rule 23(b)(2) and to remove Josue Castañeda Juarez from this action because he has been released from custody after succeeding in his immigration matter. (Dkt. # 132 at 4-6.) The court granted Petitioners' motion to amend (dkt. # 166) and Petitioners filed an amended petition and complaint (dkt. # 167). Petitioners also filed a second motion for class certification that is pending before the court. (Dkt. # 134.) The proposed class consists of all individuals detained at the NWIPC who are 55 years of age or older, or have medical conditions that the Centers for Disease Control ("CDC") has determined places them at a heightened risk of severe illness or death from COVID-19. (*Id.* at 2-3.)

Petitioner filed the instant motion for a temporary restraining order on December 11, 2020, seeking release of Petitioner Khan. (*See generally* TRO.) Petitioners also request the court: (1) grant provisional certification of the proposed class, (2) order a process to identify and

---

[2] Petitioners have filed objections to the court's order regarding the proposed discovery requests. (Dkt. # 172.)

ORDER – 3

provide expedited review of proposed class members for release, (3) order a limit to the detention population to allow for social distancing, and (4) order periodic testing of detainees, staff, and employees for COVID-19. (*Id.* at 1.) The court heard oral argument regarding Petitioners' second motion for a temporary restraining order on December 15. 2020. (Dkt. # 185.)

As noted above, the court previously denied Petitioners' motion for a temporary restraining order. (Dkt. # 91.) Petitioners now argue that recent positive COVID-19 test results from detainees and staff at NWIPC show COVID-19 has entered the general population. (TRO at 3.) Petitioners assert this constitutes a change in circumstances and establishes that Respondents have failed to stop the spread of COVID-19 at NWIPC, and therefore their Fifth Amendment right to reasonably safe conditions have been violated. (*Id.* at 14.) Petitioners also cite a recent Ninth Circuit opinion regarding COVID-19, *Hernandez Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020), to assert they can show a likelihood of success regarding their claim. (*Id.* at 14.)

Respondents contend the circumstances from Petitioners' previous motion for a temporary restraining have not changed, and that in fact, they have implemented more robust protocols in response to the evolving COVID-19 pandemic to protect both detainees and staff at the NWIPC. (*See generally* Resp.) Respondents therefore argue Petitioners have failed to show that Petitioner Khan, or proposed class members, are likely to succeed on their Fifth Amendment claim or that the conditions at NWIPC are excessive in relation to a legitimate objective of immigration detention. (*Id.*)

In addition to the declarations submitted in support of previous motions, the parties submitted declarations in support of and in opposition to Petitioners' instant motion. Petitioners submitted the declarations of Sydney Maltese (dkt. # 176), Petitioner Khan (dkt. # 177), and Dr.

ORDER – 4

Robert Greifinger (dkt. # 178). Respondents submitted the declarations of Dr. Sheri Malakhova (dkt. # 183) and Drew Bostock (dkt. # 182).

The court's previous order details the efforts taken by Respondents in response to COVID-19. (Dkt. # 91.) The instant order provides an overview of Respondents' continued efforts in response to the pandemic and the circumstances regarding individuals at NWIPC who have recently tested positive for the virus.

### B. Conditions at the NWIPC

The conditions at NWIPC are governed generally by the Performance-Based National Detention Standards 2011 ("PBNDS"). (Bostock Decl. (Dkt. # 182) at ¶ 12.) In April 2020, ICE's Enforcement and Removal Operations ("ERO") released "COVID-19 Pandemic Response Requirements" ("PRR") that provides mandatory requirements for housing detainees during the current pandemic. (*Id*. at ¶ 13.) The PRR has been updated since the pandemic began, most recently in October 2020. (*Id*.) The PRR also requires ICE to comply with the CDC's "Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities and Memorandum to Detention Wardens and Superintendents on COVID-19 Action Plan Revision 1." (*Id.* at ¶ 17.)

The PRR includes a section regarding detainees that are potentially at higher risk due to COVID-19 or are considered vulnerable under *Fraihat v. U.S. Immigration & Customs Enf't*, 445 F.Supp.3d 709 (C.D. Cal. 2020).[3] (*Id.* at ¶ 75.) Specifically, ICE is required to notify a detainee and counsel within 12 hours of being identified as an individual of high risk or meeting

---

[3] On April 5, 2020, ICE implemented custody reassessment reviews based on the CDC's criteria for individuals who are potentially at high risk due to COVID-19. (Bostock Decl. at ¶ 73.) The PRR has expanded its list of potential individuals based on the CDC's revised criteria and criteria certified in *Fraihat*. (*Id.*)

ORDER – 5

*Fraihat* criteria. (*Id.*) NWIPC also attempts to provide medical files within five days of a request. (*Id.*) Further, individuals who are at high risk are tested upon intake, as directed by medical personnel, and upon release. (*Id.*) Respondents have also required temperature and verbal screening for COVID-19 twice per day for individuals that are at high risk beginning December 14, 2020. (*Id*.) Staff at NWIPC are required to go through verbal and temperature checks for COVID-19 before entering NWIPC. (*Id*. at ¶ 54.) Any individual that does not clear the screening process is denied entry and those that do not follow the established protocols may be disciplined. (*Id.*) Face masks are required for staff who are within six feet of detainees. (*Id.* at ¶ 56.) In addition, GEO employees must wear personal protective equipment ("PPE") when interacting with others and while working in common areas. (*Id.*)

Petitioners present evidence that despite these protocols, for nine days, the detainees in Mr. Khan's unit did not have their temperature taken. (Khan Decl. at ¶ 11.) Petitioners also present evidence that while guards now wear masks, some guards wear only neck warmers or homemade masks. (*Id*. at ¶ 21.)

   1. Recent COVID-19-Positive Tests

There have been several individuals at the NWIPC who have recently tested positive for COVID-19. On November 25, 2020, a contract pharmacy technician reported to work and did not disclose that she had been tested for COVID-19 because an immediate family member had tested positive for the virus. (Bostock Decl. at ¶ 97.) After learning this information, the pharmacy technician was sent home and advised to quarantine and was later terminated for violating safety protocols. (*Id.* at ¶ 98.) This pharmacy technician worked in a pharmacy room with an ICE Health Service Corps ("IHSC") pharmacist and IHSC contract pharmacy technician. (*Id.* at ¶ 99.) These individuals did not have contact with detainees or other employees and wore

ORDER – 6

PPE while working. (*Id.*) The two pharmacy staff members that worked with the contract pharmacy technician were sent home and subsequently tested positive for COVID-19. (*Id.* at ¶ 100.) Neither has returned to NWIPC since November 25, 2020. (*Id.*)

On December 7, 2020, ICE learned that a former detainee who was transferred from NWIPC to a detention center in Florence, Arizona, tested positive for COVID-19 upon entry to the new facility. (Not. (Dkt. # 171-1) at ¶ 3; Bostock Decl. at ¶ 79.) The detainee was previously housed in general population in the "A3" housing unit at NWIPC, the same housing unit that Petitioner Khan was previously housed in. (Bostock Decl. at ¶ 79.) The detainee tested negative for COVID-19 on November 30, 2020, and was placed in a separate housing unit designated for detainees awaiting departure from NWIPC until his transfer to Arizona on December 1, 2020. (*Id.*) Based on the detainee's two-day travel from NWIPC to Arizona, which included travel through other staging facilities, and after consulting with the Tacoma Pierce County Health Department, Respondents have not reached a conclusion regarding whether the detainee had COVID-19 when he was at NWIPC. (*Id.* at ¶ 80.)

Prior to this detainee's positive test result, the A3 housing unit was cohorted because another detainee complained of COVID-19 type symptoms. (Bostock Decl. at ¶ 81.) The detainee was transferred to medical isolation and later tested negative for COVID-19. (*Id.*) Detainees in the A3 housing unit continued to be cohorted and were tested for COVID-19 based on the test results from the detainee transferred to the Arizona facility. (*Id.* at ¶ 82.) At that time, there were 14 detainees in A3, which has capacity for 90 beds. (*Id.*) Only one detainee tested positive for COVID-19. (*Id.* at ¶ 84.) Twelve staff members were also tested and had negative test results. (*Id.* at ¶ 83.) The detainee who tested positive was transferred to an airborne infection isolation room. (*Id.* at ¶ 84.) The other thirteen detainees from that housing unit who

ORDER – 7

tested negative were provided new clothing and relocated to an unused housing unit while wearing face masks. (*Id.* at ¶ 85.) The detainees were housed one detainee per cell. (*Id.*) The detainee who initially tested positive for COVID-19 subsequently tested negative for the virus three times.[4] (Not. (Dkt. # 184-1) at ¶ 3; Not. (Dkt. # 186-1) at ¶ 3.)

Petitioner Khan submitted a declaration stating his housing unit was not informed that a detainee had tested positive for COVID-19. (Khan Decl. at ¶ 2.) Respondents refute Petitioner Khan's assertion, arguing IHSC and GEO staff informed the detainees of the reasons for the need to quarantine. (Bostock Decl. at ¶ 102.) On December 12, 2020, Petitioner Khan reported experiencing a sore throat and lack of sense of taste. (*Id.* at ¶ 90.) He has since tested negative for COVID-19. (Not. (Dkt. # 186-1) at ¶ 5.) Another detainee from the A3 unit reported experiencing symptoms but has also since tested negative for COVID-19. (*Id.* at ¶ 4.)

Respondents recently submitted a notice on December 16, 2020, explaining that a GEO employee tested positive for COVID-19 on December 12, 2020. (Not. (Dkt. # 187-1) at ¶ 4.) The employee was a kitchen worker at NWIPC. (*Id.* at ¶ 6.) IHSC identified three detainees who worked in the kitchen with this GEO employee who have been transferred to medical quarantine and tested for COVID-19. (*Id.* at ¶ 8.) The detainees were not housed in A3 with Petitioner Khan. (*Id.*) Respondents represent that IHSC will conduct prevalence testing in the housing units of these detainees. (*Id.*)

Respondents also submitted notices of other positive test results of COVID-19 for individuals at NWIPC. (*See*, *e.g.*, Not. (Dkt. ## 87, 92, 96, 99, 100, 101, 114, 115, 116, 118, 119, 122, 123).)

---

[4] Respondents conducted COVID-19 antibody tests for this detainee, which were negative. (Not. (Dkt. # 186-1) at ¶ 3.) Respondents are investigating whether it can determine if the original test was a false positive. (*Id.*)

ORDER – 8

2. New Detainees

IHSC conducts pre-intake temperature and verbal prescreening checks for new detainees to NWIPC. (Bostock Decl. at ¶ 19.) Detainees are provided a handbook that outlines hygiene procedures and instructs detainees regarding how to visit the medical clinic. (*Id.* at ¶ 21.) NWIPC also has New Intake Monitoring housing units ("NIMS") that monitor incoming detainees for 14 days. (*Id.* at ¶ 23.) Detainees admitted on different dates, or who have different risk classification levels, are housed separately. (*Id.*)

3. Social Distancing Measures

The NWIPC has the capacity to house 1,575 detainees. (Bostock Decl. at ¶ 7.) As of December 12, 2020, it housed only 290 detainees. (*Id.*) Of the 21 housing units at NWIPC, two units are used for the 14-day observation of new intakes, a medical housing unit, and a special management unit. (*Id.* at ¶ 36.) Another unit is used for detainees who have been tested for COVID-19 and are awaiting removal via ICE Air. (*Id.*) Two to three units remain empty for emergency purposes, including the possibility of a COVID-19 outbreak. (*Id.*) The bed ratios in the housing units range from 7.8% to 45.3%. (*Id.* at ¶ 37.) GEO implemented head to foot sleeping arrangements to provide more space between detainees. (*Id.* at ¶ 39.) Food is delivered to housing units during staggered mealtimes, and detainees are allowed to eat within common rooms or their bunks. (*Id.* at ¶ 40.) Each housing unit has a designated time to move within the facility to recreation, religious services, and the law library to prevent comingling with other housing units. (*Id.* at ¶ 41.)

4. Hygiene Measures

Janitorial services are typically conducted by detainee workers on a voluntary basis. (Bostock Decl. at ¶ 28.) Detainees who are quarantined or in medical isolation are not allowed to

ORDER – 9

conduct these services. (*Id.*) A GEO Sanitation Officer is responsible for monitoring the detainee workers. (*Id.* at ¶ 29.) In housing units where no detainees volunteer to conduct janitorial services, GEO employees are responsible for providing cleaning services. (*Id.*) GEO maintains sanitation logs regarding the cleaning services conducted multiple times a day. (*Id.*) GEO also provides detainees and staff supplies for handwashing, including soap, water, hand drying machines, disposable paper towels, and no-touch trash receptacles. (*Id.* at ¶ 30.) GEO has also implemented enhanced measures in housing units, food preparation and service areas, and intake rooms. (*Id.* at ¶ 29.) GEO conducts weekly town hall meetings in housing units to educate detainees on hygiene. (*Id.* at ¶ 31.) IHSC also conducts weekly townhall meetings to educate detainees about COVID-19 and how to prevent the spread of the virus. (*Id.* at ¶ 32.) GEO also offers detainees masks three times per week. (*Id.* at ¶ 34.)

     5. <u>Visitors and Staff</u>

Social visitation is temporarily suspended at NWIPC. (Bostock Decl. at ¶ 47.) Attorney visits are limited to noncontact visits, however, contact visits are allowed if necessary and approved by an ICE officer. (*Id.* at ¶ 50.) Attorneys are required to wear PPE during such visits. (*Id.*) ICE also provides eleven rooms at NWIPC with electronic tablets to facilitate private videoconferencing with detainees and counsel. (*Id.* at ¶ 51.) Guards are required to wear masks while in common areas of NWIPC and whenever they are within six feet of detainees. (*Id.* at ¶ 56.) However, Petitioners present evidence that guards often fail to wear masks or other PPE. (Second Avendaño Decl. (Dkt. # 141) at ¶ 3; Second Khan Decl. (Dkt. # 138) at ¶ 7; Second Nerheim Decl. (Dkt. # 143) at ¶¶ 7-8.)

\\

\\

ORDER – 10

### C. Petitioner Khan's Detention Status

Mr. Khan is 48 years old, a citizen of Pakistan and a Lawful Permanent Resident of the United States. (First Khan Decl. (Dkt. # 9) at ¶ 1.) He is detained and subject to removal based on his violation of a domestic violence no-contact order issued by the Snohomish County District Court and criminal stalking of his ex-wife. (5/17/2020 Bostock Decl. (Dkt. # 63) at ¶ 78.) An Immigration Judge granted him cancellation of removal for certain residents under 8 U.S.C. § 1229b(a), but DHS appealed the decision. (*Id.*) Petitioner Khan is held under 8 U.S.C. § 1226(a) while his appeal is pending. (*Id.*) An Immigration Judge denied him bond based on a finding that he was a danger to the community and a flight risk based on his continued violation of the protective order. (*Id.*) If released, Mr. Khan will stay with his friend while he determines his long-term living options. (TRO at 11; First Khan Decl. at ¶ 17.) Respondents determined Petitioner Khan's diabetes consisted of a chronic care condition that placed him "at heightened risk of severe illness and death upon contracting the COVID-19 virus." (Notice of Custody Determination pursuant to *Fraihat* (Dkt. # 176-9).) [5] On December 1, 2020, ICE determined continued detention was appropriate under the ERO PRR standards. (Bostock Decl. at ¶ 76.)

### III.   ANALYSIS

### A. Legal Standard

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977). A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24

---

[5] As noted above, the most recent ERO PRR includes requirements in the *Fraihat* order. *See* https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

ORDER – 11

(2008). "The proper legal standard for preliminary injunctive relief requires a party to demonstrate (1) 'that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20).

As an alternative to this test, a preliminary injunction is appropriate if "serious questions going to the merits were raised and the balance of the hardships tips sharply in the plaintiff's favor," thereby allowing preservation of the status quo when complex legal questions require further inspection or deliberation. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). However, the "serious questions" approach supports the court's entry of a TRO only if the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest. *Id.* at 1135. The moving party bears the burden of persuasion and must make a clear showing that it is entitled to such relief. *Winter*, 555 U.S. at 22.

For the reasons set forth below, the court DENIES Petitioners' second motion for a TRO.

**B. Likelihood of Success on the Merits**

To obtain a TRO, Petitioners must make a clear showing that they are likely to succeed on the merits or, alternatively, have raised serious questions going to the merits of their habeas petition. To succeed on a habeas petition, Petitioners must show that they are "in custody in violation of the Constitution or laws or treaties of the United States." *See* 28 U.S.C. § 2241. Here, Petitioners argue that the continued detention of Petitioner Kahn, and similarly situated proposed class members in conditions that allegedly present an unreasonable risk of serious

illness or death, violate their Fifth Amendment substantive due process rights[6] to: (1) reasonably safe conditions of confinement; and (2) conditions that do not amount to punishment. (TRO at 13-20.) For the reasons stated below, the court concludes that Petitioners have failed to make a clear showing that they are likely to succeed on the merits of their Fifth Amendment claims, or that they have raised serious questions going to the merits of their claims.

### 1. Right to Reasonably Safe Conditions

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).[7] The government thus violates the Due Process Clause if it fails to provide civil detainees with "food, clothing, shelter, medical care, and reasonable safety." *Id.* at 200. In the context of a "failure to protect" claim under the Due Process Clause, the Ninth Circuit analyzes government conduct under an objective deliberate indifference standard. *See Castro v. Cty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (adopting objective deliberate indifference standard based on *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) to evaluate failure to protect claim brought by pretrial detainee). Under this standard, the defendant's conduct "must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case." *Id.* (internal quotations omitted). To demonstrate objective deliberate indifference, a plaintiff must show:

> (i) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

---

[6] As federal civil detainees, Petitioners are protected by the Fifth Amendment. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

[7] In *DeShaney*, the Supreme Court analyzed the petitioners' rights under the Fourteenth Amendment. *See* 489 U.S. at 194-95. Fifth Amendment due process claims and Fourteenth Amendment due process claims are analyzed in the same way. *See Paul v. Davis*, 424 U.S. 693, 702 n.3 (1976).

ORDER – 13

  (ii) Those conditions put the plaintiff at substantial risk of suffering serious harm;

  (iii) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

  (iv) By not taking such measures, the defendant caused the plaintiff's injuries.

*Id.*

Petitioners argue that the positive tests of individuals at NWIPC, including detainees in general population, shows Respondents have failed to provide reasonably safe conditions to vulnerable detainees. (TRO at 16-17.) Petitioners cite the court's decision in *Pimentel-Estrada II*, that found NWIPC had inadequate testing, social distancing, and hygiene policies. (*Id.* (citing *Pimentel-Estrada v. Barr*, No. C20-495-RSM-BAT, 2020 WL 2092430 (W.D. Wash. Apr. 28, 2020) (identifying "glaring deficiencies" in the Government's efforts to protect high-risk detainees from serious harm). Petitioners also cite the Ninth Circuit's recent decision in *Hernandez Roman*, in which the Ninth Circuit found the government likely failed to provide reasonably safe conditions to detainees because of a lack of social distancing and inadequate hygiene. *Hernandez Roman v. Wolf*, 977 F.3d 935 (9th Cir. 2020). Petitioners assert NWIPC continues to have inadequate testing and does not follow its own COVID-19 policies, including proper screening and wearing masks. (TRO at 17.) Petitioners also maintain social distancing is not possible and Respondents' hygiene and cleaning policies have been inadequate to stop the spread of COVID-19 within NWIPC. (*Id.*) Petitioners assert Respondents have been on notice about the risks to vulnerable detainees with regard to COVID-19 and have failed to take adequate precautions to protect them. (*Id.* at 14-18.) Petitioners therefore argue Respondents are

ORDER – 14

not able to abate the substantial risk of serious harm and therefore violate Petitioners' Due Process rights.[8] (*Id.* at 14-18.)

Respondents contend Petitioners have not shown that the conditions at NWIPC with regard to COVID-19 are objectively unreasonable, and that to establish a constitutional violation, Petitioners must show more than a potential risk of injury. (Resp. at 15-16.) Respondents also argue that unlike the conditions in *Hernandez Roman*, ICE has reduced its population at NWIPC and rearranged detainee housing to allow for social distancing. (*Id.* at 17-18 (citing Bostock Decl. at ¶¶ 7 n.1, 36-38).) Respondents further assert guards are required to wear masks or face coverings, new detainees are not commingled with the general population, and sanitation and hygiene measures have been increased. (*Id.*)

Respondents also assert their testing procedures are adequate. (Resp. at 18.) Respondents argue that in addition to providing voluntarily testing upon arrival, they also test detainees when reassigning housing units and prior to release. (*Id.* (citing Bostock Decl. at ¶¶ 24, 45; Malakhova Decl. at ¶ 33.) Respondents note that since November 2020, 179 tests have been conducted with detainees, in addition to tests for newly arriving detainees, and all have been negative. (*Id.* at 18-19.) Respondents also represent they are developing a Prevalence Testing Operational Plan that will periodically test detainees throughout the facility. (*Id.* at 19.)

The court finds Petitioners have not shown the circumstances at NWIPC establish they are being denied a reasonable right to safety. As previously stated in *Dawson v. Asher*, "[n]o one can entirely guarantee safety in the midst of a global pandemic." No. C20-409-JLR-MAT, 2020

---

[8] Petitioners assert that the rate of the virus in immigration facilities is "on average more than 13 times the rate among the general population." (TRO at 4 (citing Maltese Decl., Ex. B.) Petitioners note that since the first case of a detainee testing positive for COVID-19 in immigration custody, almost 8,000 detainees have tested positive. (*Id.* (citing Maltese Decl., Ex. H).)

ORDER – 15

WL 1704324, at *12 (W.D. Wash. Apr. 8, 2020). Since the court's previous ruling denying Petitioners' motion for a temporary restraining order, and since the ruling in *Pimentel-Estrada*, Respondents have taken significant measures to prevent the spread of COVID-19. As noted above, Respondents have procedures in place to review custody determinations, have plans to implement further prevalence testing, and have reduced the population at NWIPC.[9]

The conditions in *Hernandez Roman* are distinguishable from NWIPC's current conditions of confinement. In *Hernandez Roman*, the Adelanto Immigration and Customs Enforcement Processing Center had 58 detainees that tested positive for COVID-19, nine of whom were hospitalized. 977 F.3d at 938, 940. Twenty of the detainees who tested positive were medically vulnerable. *Id.* In addition, the Ninth Circuit found, *inter alia*, the facility was too crowded to allow for social distancing, detainees had inadequate access to masks, guards were not required to wear masks, there was a lack of cleaning supplies, detainees slept within six feet of each other, new arrivals were not adequately quarantined or tested, and there were only three functioning showers for 118 detainees. *Id.* at 943.

NWIPC's current conditions present the court with different circumstances. As of December 13, 2020, the detainee population was at 18.4% of NWIPC's capacity. (Bostock Decl. at ¶ 7.) Although Petitioner Khan is currently housed in an airborne infection isolation room, he was previously housed in the A3 unit, which contained only 14 detainees despite the unit's 90 beds, 13 tables in the common areas, seven toilets, and eight showers. (*Id.* at ¶¶ 82; Lippard Decl. (Dkt. # 104) at ¶ 108.) The housing units at NWIPC have bed ratios ranging from 7.8% to 45.3%. (Bostock Decl. at ¶ 37.) Further, guards are required to wear masks. (*Id.* at ¶ 56.) NWIPC

---

[9] The court also finds that based on the parties' briefing regarding class certification, a determination on this matter is unnecessary in the instant TRO motion.

ORDER – 16

also tests detainees during intake, whenever detainees are reassigned housing units, and before they are transferred or removed from NWIPC. (*Id.* at ¶¶ 24, 45.)

With regard to the individuals at NWIPC who most recently tested positive for COVID-19, it appears Respondents have taken reasonable measures to prevent the spread of the virus. The pharmacy staff members who tested positive did not have contact with detainees. All three were sent home to quarantine and the individual who violated NWIPC's protocol had their employment terminated. The detainee who tested positive after arriving at a detention center in Arizona previously tested negative for the virus at NWIPC before his departure, and it is not clear when he contracted the virus. Lastly, although there has been one detainee in general population to test positive, Respondents responded by cohorting the unit and testing the other individuals. They are currently investigating whether this was also a false positive and are projected to soon implement prevalence testing. Respondents are also already conducting reviews of detention determinations. While it is unknown at this time how many detainees may test positive for COVID-19 at NWIPC in the future, the Court finds the current number of detainees to test positive, and Respondents' efforts to prevent the spread of the virus, are far different than the circumstances in the facility at issue in *Hernandez Roman.*

The Court notes Petitioners have presented evidence that not all individuals are following NWIPC's procedures, such as guards failing to wear masks and staff failing to test highly vulnerable detainees' temperature twice a day. The COVID-19 pandemic is rapidly evolving, as is Respondents' response to the pandemic. Based on the record before the court, it appears Respondents have implemented intentional procedures, including the requirement for staff to wear masks, to prevent the spread of COVID-19. The court cannot find at this time that reports of some individuals' failure to follow procedures render Respondents' measures unreasonable or

ORDER – 17

make the conditions as NWIPC so unsafe as to constitute a violation of Petitioners' constitutional rights. Accordingly, the court finds Petitioners have failed to demonstrate a likelihood of success on the merits of their Fifth Amendment "reasonable safety" claim or that they have raised serious questions going to the merits of their claim.

2. Conditions Amounting to Punishment

Petitioners also argue continued detention is excessive in relation to any legitimate government interest. (*See* TRO at 19-20.) To evaluate the constitutionality of pretrial detention conditions under the Fifth Amendment, a district court must determine whether those conditions "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Kingsley*, 576 U.S. at 396-99. Punishment may be shown through an express intent to punish or a restriction or condition that "is not reasonably related to a legitimate governmental objective." *Bell*, 441 U.S. at 539; *see also Kingsley*, 576 U.S. at 398 (clarifying that "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose").

Petitioners have failed to make a clear showing that the continued detention of Petitioner Khan and proposed class members is not reasonably related or excessive in relation to a legitimate government interest. Petitioners assert the question of whether detention is reasonable must be framed in the context of the current pandemic as opposed to normal circumstances. (TRO at 18.) Petitioners argue that because vulnerable detainees have alternative options to detention, continued detention is excessive in relation to any legitimate governmental interest. (*Id.* at 19.)

ORDER – 18

The Supreme Court has recognized a legitimate government interest in ensuring that non-citizens appear for their removal or deportation proceedings and protecting the community from harm. *See Jennings v. Rodriguez*, ___ U.S. ___, 138 S.Ct. 830, 836 (2018); *Demore v. Kim*, 538 U.S. 510, 520-22 (2003); *Zadvydas v. Davis*, 533 U.S. at 690-91. As discussed above, Respondents' substantial steps to abate the risk of COVID-19 have thus far been effective at preventing a widespread COVID-19 outbreak at NWIPC. While there have been a limited number of individuals to test positive for the virus, Respondents continue to implement practices to abate the risk of an outbreak. The court cannot conclude that continued detention outweighs or is excessive in relation to any legitimate governmental interest. Accordingly, the court finds Petitioners unlikely to succeed on their Fifth Amendment due process claim that their continued detention amounts to punishment.

**C. Likelihood of Irreparable Harm**

The court also concludes that Petitioners have failed to meet their burden to show that "irreparable harm is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Petitioners frame the recent positive COVID-19 tests at NWIPC as an "outbreak." However, as discussed above, there have been a limited number of individuals that have tested positive, particularly in general population. Respondents have taken measures to prevent the spread of COVID-19, such as reducing the detainee population and testing and quarantining incoming detainees and detainees complaining of symptoms. Given Respondents' precautions, the court cannot conclude that Petitioners are at risk of irreparable harm without the requested relief.[10] Accordingly, the court DENIES Petitioners' second motion for a TRO.

---

[10] Because the court concludes Petitioners fail to meet the first two prongs of the TRO standard, the court need not address the final prongs.

ORDER – 19

## IV.   CONCLUSION

For the foregoing reasons, the court DENIES Petitioners' motion for a temporary restraining order and expedited bail hearings (dkt. # 175). Respondents represent that the implementation of its prevalence testing plan is projected to begin on or about December 23-24, 2020. (Malakhova Decl. (Dkt. # 186-1) at ¶ 6.) Respondents are ordered to submit a report to the court regarding the status of prevalence testing at NWIPC by January 4, 2020.

Dated this 18th day of December, 2020.

JAMES L. ROBART
United States District Judge

Recommended for Entry
this 18th day of December, 2020.

MICHELLE L. PETERSON
United States Magistrate Judge

ORDER – 20